UNITED STATES, Appellee

v

THOMAS BERRY, Jr., Private E–2, U. S. Army, Appellant

6 USCMA 638, 20 CMR 354

639

640

No. 7108

Decided February 10, 1956

*First Lieutenant Gene E. Overbeck* argued the cause for Appellant, Accused. With him on the brief was *Captain Frank C. Stetson.*

*Captain Vernon M. Culpepper* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused comes before us adjudged guilty of aggravated assault (intentional infliction of grievous bodily harm), in violation of Article 128, Uniform Code of Military Justice, 50 USC § 722. He was sentenced to dishonorable discharge, total forfeitures, and confinement for four years, and intermediate appellate agencies have af-

firmed. He urges four errors, which will be discussed seriatim.

At about 7:00 a.m., on January 1, 1955, the accused entered a unit billet in Panzer Kaserne, Boeblingen, Germany, and attempted to arouse Private Jenkins, a friend of his who was billeted there. He experienced considerable difficulty in accomplishing his purpose, and the noise he created disturbed the sleep of Corporal Inman, another occupant of the four-man room. Because Jenkins had asked the accused to let him alone, and because his own rest had been interrupted, Corporal Inman several times asked the accused to leave the room. By way of reply, the accused ordered the corporal to shut up or face a whipping. This led the corporal to arise from his bed, go over to the accused, and explain to him the likely consequences of any physical encounter. The accused responded by striking Inman on the side of the head, and a general scuffle ensued, during the course of which the accused cut Inman, the victim, with a knife. The wound was on the front portion of the left chest, it was over six inches in length, and it was deep enough to permit the lung to protrude. The corporal did not notice the gash until after he had ejected Berry from the room. Upon its discovery, he immediately sought medical aid, and he was still hospitalized at the time of trial. Within minutes after the cutting, the accused expressed to the victim his sorrow concerning the matter, and thereafter turned himself in at the guardhouse.

The accused testified that when Corporal Inman got out of bed, accused drew his knife, opened it, and held it in his hand. He said that his victim struck the first blow, and that during the scuffle he held his knife hand up near the corporal's chest. He had not cut his victim intentionally and had drawn the knife as a bluff, thinking Inman would not start a fight if he saw it. Lastly, the accused testified he was sorry this ever happened, both for his victim who got cut, and for himself, because he knew that "I'm going to get something out of it."

## II

During the course of his instructions, the law officer first gave the elements of the principal offense charged, and then proceeded to discuss them in detail. After informing the court-martial concerning the legal meaning of "grievous bodily harm," he continued:

". . . In this case when the accused, in his testimony, described his act in pulling the knife out of his pocket, opening the blade, and extending it toward the victim, Corporal Inman, he made a judicial confession of the offense of an aggravated assault with a dangerous weapon. However, he has denied the portion of this charge which alleges intentional infliction of grievous bodily harm. When grievous bodily harm has been inflicted by means of intentionally using force in a manner likely to achieve that result, it may be inferred that grievous bodily harm was intended."

He next discussed how intent might be proved, and said:

"If you are not satisfied beyond a reasonable doubt that the accused did intentionally inflict grievous bodily harm upon the victim you may still reach a finding of guilty of the lesser included offense of assault with a dangerous weapon. In this event it will be necessary for you to delete the words as to which you have a reasonable doubt, which, in this case would be the words following the word, 'knife,' in the specification in order to reach a finding as to which you have no reasonable doubt."

Next came the standard instruction on reasonable doubt, weight of the evidence, and credibility, including the following:

". . . The final determination as to the weight of the evidence and the credibility of the witnesses in this case rests solely upon you members of the court. You must disregard any comment or statement made by me during the course of the trial which may seem to indicate an opinion as to the guilt or innocence of the accused, for you alone have the independent responsibility of deciding the issue. Each of you must impar-

tially resolve the ultimate issue as to the guilt or innocence of the accused in accordance with the law, the evidence admitted in court and your own conscience."

Some four minutes after the court closed to deliberate, the law officer reopened the court and gave the following additional instructions:

"Just after the court closed the law officer realized he had not given you a complete instruction with reference to the accused's contention that he did not intentionally cut the victim. The accused's contention in this case, according to his testimony, was that the extent of the assault consisted of his drawing the knife from his pocket, opening the blade, and extending the knife toward the victim. As I stated before, it is my opinion that it is a judicial confession of the offense of assault with a dangerous weapon not consummated by a battery. Therefore, I should have added that if you are not satisfied beyond a reasonable doubt that the accused is guilty, as charged, of aggravated assault consummated by the intentional infliction of grievous bodily harm, if you are not satisfied that the accused intentionally struck the victim with the knife at all, then, but you are satisfied beyond a reasonable doubt that the accused committed an assault as I had defined the offense of assault with a dangerous weapon, then it would be necessary for you to except not only the words following the word 'knife,' but also the words 'cutting him on the chest.' Such a finding could be made by substituting for the last group of words, words which would more accurately describe it as being merely the offense of aggravated assault by an offer or an attempt, or by not substituting anything at all for the words, 'by cutting him on the chest.' The result of such exception would leave the specification reading: 'In that Private Thomas Berry, Junior, US Army, Wire Operation Company, 97th Signal Battalion, did, at Boeblingen, Germany, on or about 1 January 1955, commit an assault upon Corporal Ernest D. Inman with a dangerous weapon, to wit: a knife.'

"The court should realize that these instructions given you about the possibility of a lesser included offense do not intend to indicate the opinion of the law officer that the accused is guilty of only the lesser included offense or guilty at all. In regard to the contention of the accused raised in his testimony I am required to give you this instruction."

At the request of defense counsel, he then explained that the word "contention" should be understood to mean "issue."

III

The accused first of all argues that the law officer erred to his material prejudice by misinforming the court-martial as to the facts of the case. In particular, he complains that there was no justification for the law officer's statement that the accused had admitted extending the open knife toward the victim, and that his statement in that regard effectively induced the fact finders to believe, erroneously, that a controverted question of fact should be resolved adversely to the accused.

It is true that in United States v Andis, 2 USCMA 364, 8 CMR 164, we gave our approval to the military rule permitting fair comment on the evidence by the law officer, but we expressly included this warning:

". . . The judge must be cautious not to infringe on the accused's right to an impartial trial by jury. The judge cannot determine the facts, but he can express an advisory opinion. In all cases, he must make it clear to the jury that his opinion as to the evidence—except, of course, on questions of law—is not binding. The Federal courts recognize that while comment can be of inestimable aid to the jury in arriving at a just verdict, it can, misused, create irreparable harm. To protect the accused in criminal trials, it is provided that the judge in his comments must not distort or add to the evidence; that he must not draw un-

warranted inferences and must not emphasize, in summing up the evidence, portions in favor of one party and minimize those in favor of the other. He can make no appeal to the passions and prejudices of the jury, nor be argumentative in favor of or against one of the parties. He is permitted to express an opinion even on the guilt of the defendant, so long as he advises the jury clearly and unequivocally that his opinion is not binding."

In making the questioned statement, the law officer was operating in a delicate area but, as we interpret the evidence of record, we do not believe he offended against the warning. On the contrary, we think his statement of the evidence was substantially correct and within the prerogative accorded to him, for the accused had sworn that he drew his knife, opened it, and held it up near his victim's chest. His admitted purpose in drawing the weapon was to frighten the corporal, for he described his reason in the following words, "I held the knife right in my hand because anybody that sees a knife they won't come up to a knife." With that purpose in mind, and in light of the circumstances of this situation, it is almost impossible to believe that the accused could have failed to extend his knife toward the victim and yet inflict the physical injuries shown by this record. Were we to accept defense counsel's own version of the evidence that accused merely held the knife and the victim rushed upon it, we could only conclude that the accused "extended" the knife, at least to a degree, within a fair meaning of the word. Webster's New International Dictionary, 2d ed, 1952, page 900.

Assuming, arguendo, that the questioned portion of the law officer's statement of the evidence overstates the record, we cannot believe that the accused was thereby prejudiced. If the comment went beyond the evidence, it did so by only the narrowest of interpretations. Indeed, the error which has been noticed upon appeal was so minor that trial defense counsel must not have observed it, for he failed to offer any objection to the law officer's statement

**644**

of the evidence, and he was alert enough to call the law officer's attention to other variances. Surely, there is a real distinction between a remark such as this, and those found in cases like Quercia v United States, 289 US 466, 53 S Ct 698, 77 L ed 1321 (1933); or Billeci v United States, 184 F2d 394 (DC Cir) (1950), cases relied upon by the accused. In the former case, the trial judge devoted one paragraph of his charge to the quality of the defendant's testimony, and concluded by saying of him, "I think that every single word that man said, except when he agreed with the Government's testimony, was a lie." In the latter instance, the trial judge informed the fact finders, in a contested case, of his own views in the following terms (which he borrowed from Horning v District of Columbia, infra):

> " ' "In a criminal case the court cannot peremptorily instruct the jury to find the defendant guilty. If the law permitted it, I would do so in this case . . .

> " ' "In conclusion I will say to you that a failure by you to bring in a verdict in this case can arise only from a willful and flagrant disregard of the evidence and the law as I have given it to you, and a violation of your obligation as jurors." ' "

In the instant case, the comment by the law officer was no more than an inference that any reasonable person would draw from the accused's own testimony. That he had no intention of interfering with the court's duty finally to resolve the factual issue may be gathered from the concluding part of his charge, where he instructed the court-martial members to disregard any of his comments which might seem to indicate his opinion as to the accused's guilt or innocence, and that they alone were obligated to decide the facts and reach a verdict. Under these circumstances, we cannot say that the law officer's error, if any, materially prejudiced the accused.

## IV

We come, then, to the question of the propriety of the law officer's instruc-

tion to the effect that the accused had judicially admitted the offense of assault with a dangerous weapon. Government counsel argue very earnestly that the law officer did no more than express his own personal opinion to that effect, and we think it is a fair characterization of his remarks. If he intended to instruct the court-martial members that they must find the accused guilty of no lesser offense than assault with a dangerous weapon, he effectively circumvented that intention when he told them that his reference to a lesser offense should not be interpreted as a belief on his part that accused was guilty of any offense. However, defense counsel contends that he erred, urging that the accused pleaded not guilty and as a witness denied that he had committed as much as a simple assault upon the victim, and this contention merits some consideration.

In beginning our development, we recognize that the accused pleaded not guilty, and nominally, at least, thereby placed in issue all material allegations of the charge. But as early during the trial as voir dire, defense counsel put this question to the court-martial:

"May I ask the court members, does any member of the court feel that if a man is probably guilty of something he is necessarily guilty of what he is charged with?"

During the course of his testimony, the accused admitted that he had drawn the knife, opened it, and held it up near the victim's chest, and he knew he was "going to get something out of it." Certainly this was a tacit admission by the accused that he knew he was not guiltless. Defense counsel in his closing argument fought only the question of the accused's intent, saying at various times, "All of this is not to suggest that Berry's conduct was not bad and that he is guiltless but I ask you to consider carefully what was his intention?" and "if you are not morally certain of that [the intent charged] then perhaps you should find him guilty of something slightly lesser than what he is charged with."

It cannot seriously be urged that the accused intended to raise any issue of self-defense, for even though he testified that he drew and opened the knife only to discourage the victim from attacking him, he must have sensed that scant credence would be given to that contention, inasmuch as the room was dark at the time of the assault and the only illumination came from a hallway light. The victim was where he had a right to be, and accused offered nothing to show that he had reason to believe that the use of a knife was necessary to meet the force threatened by the victim. Moreover, the accused admitted that he had known Inman for about four months, knew him to be a superior noncommissioned officer, and yet had replied in a provoking manner to what he could only have understood to be an order to leave the room, given after Jenkins had clearly told the accused he did not want to get up. Defense counsel seems to have recognized all this, for in a closed conference the law officer asked defense counsel if he intended to claim self-defense, and counsel replied that he did not believe instructions on that subject would be necessary. Furthermore, when the law officer informed counsel that he intended to instruct on only one lesser included offense, defense counsel stated he had nothing further to request. And when the law officer informed the fact finders that the accused had admitted his guilt of the offense of assault with a dangerous weapon, counsel did not object, although he did object to other parts of the instruction. Quite clearly, then, it was the belief of all the parties to the trial that only the offense charged and the lesser offense of assault with a dangerous weapon were in issue.

When we turn to the facts found in the record, we can only conclude that their analysis of the evidence was correct. At best, the accused stood in the position of one who engages in mutual combat, for one with a right to do so had ordered him from the room before the parties came to blows. When, under those circumstances, the accused refused to leave and introduced a dangerous weapon into the affray, and

thereby rendered likely the infliction of just the sort of serious injury as did occur, he committed an aggravated assault. Cf. United States v Wilson, 5 USCMA 783, 19 CMR 79.

If we assume, as does defense counsel, that the victim was wounded when he rushed upon the knife held █ by the accused, and so impaled himself, the same conclusion must follow. The parties were in a small room and they were not much more than an arm's length removed from each other. Each claimed the other struck the first blow, but the accused admitted that he was ready with his knife before the first blow was struck. Once the knife was drawn, opened, and held in accused's hand, it could be used in the merest fraction of a second. We do not believe that the assault could not be completed until after the knife was pointed at the victim. Brandishing a knife at a distance near enough to the prospective victim to render it likely that he may be injured, may be sufficient regardless of the direction in which the blade is pointed. True enough, █ mere preparation for an assault does not complete the offense, but holding an open knife in the hand, at the time of an impending affray, within reasonable striking distance, amounts to more than preparation. United States v Smith, 4 USCMA 41, 15 CMR 41. It is an act in partial execution of the use of the knife, and completes the offense. Our views on this issue accord with those stated in Johnson v State, 132 Ark 128, 200 SW 982 (1918), where it was said:

"The question presented is whether a mere drawing of a pistol with intent to use it, but without actually presenting it in the attitude of firing, constitutes assault. There is a conflict in the authorities on this question (2 Wharton's Criminal Law, § 800; 2 Bishop on Criminal Law, §§ 30, 31; People v McMakin, 8 Cal. 547; State v Epperson, 27 Mo. 255; State v Marsteller, 84 N. C. 726; Tarver v State, 43 Ala. 354), but we are of the opinion that the better rule is that the act of drawing the pistol, if accompanied by threats evidencing an intention to use it on the person threatened, constitutes an assault. The turning point of the question of whether a given act does or does not constitute an assault is whether the overt act is merely in preparation for the assault or a part of the perpetration of the assault. Anderson v State, 77 Ark. 37, 90 S. W. 846. Mere preparation for an assault does not complete the offense, but any overt act in partial execution of the design to make an assault completes the offense. The drawing of a deadly weapon is so intimately connected with its use that it cannot be said to be merely a preparation for the use, but is a part of the use itself, such an act constitutes an assault when accompanied by evidence of an intention to immediately use the weapon."

From what has been said, it necessarily follows that the accused committed an assault with a dangerous █ weapon when he prepared the knife and had it ready for immediate use in the affray. All of these facts he admitted while on the stand. Surely, then, the law officer did not err when he relied upon accused's testimony in framing his instructions. Furthermore, the law officer's conception of the offenses in issue was supported by the course of conduct indulged in by defense counsel. If a judge may inform a jury, in a criminal case where the facts are undisputed, that they have a duty to return a finding of guilty, Horning v District of Columbia, 254 US 135, 41 S Ct 53, 65 L ed 185 (1920), we cannot find prejudicial error in these instructions. There was no direction by this law officer that a finding of guilty must be returned. He ventured his opinion that accused's testimony amounted to a judicial confession, but he made it clear that the court-martial was at liberty to disregard that opinion and return a finding of not guilty.

We have no quarrel with cases like United States v Murdock, 290 US 389, 54 S Ct 223, 78 L ed 381 (1933), for we believe that in a case where defendant's intent is contested a judge clearly prejudices an accused if he informs the jury of his opinion that the de-

fendant is guilty and does not fairly leave to them the decision on the issues of fact. Such a dispute, "albeit a fragile one," must be left to them. United States v Link, 202 F2d 592 (CA 10th Cir) (1953). But when we apply that rationale to this case, it is first of all certain that the law officer fairly submitted to the fact finders the question of the accused's intent at the time of the cutting. Secondly, there was no dispute about the essential facts necessary to establish the lesser offense commented on by the presiding officer. Under those circumstances, he could inform the court members that, as a matter of law, those facts added up to a judicial confession. In military law, when an accused pleads guilty, the court members have a duty to return a finding of guilt, and surely it would be appropriate for a law officer to inform a court that the accused had judicially confessed. Here the facts amount to just that, but even then, the law officer left the matter open to the fact finders. Considering the instructions together, he told them:

". . . You must disregard any comment or statement made by me . . . which may seem to indicate an opinion as to the guilt or innocence of the accused, for you alone have the independent responsibility of deciding the issue. . .

* * * * *

"The court should realize that these instructions given you about the possibility of a lesser included offense do not intend to indicate the opinion of the law officer that the accused is guilty of only the lesser included offense or guilty at all."

V

The third issue of importance grows out of three questions asked by the law officer of the accused while the latter was on the stand as a witness, and certain of the former's instructions concerning the intent of the accused. Defense counsel argue that by these questions and instructions, the law officer demonstrated a hostility against the accused, and caused the court-martial members to conclude that the accused was not worthy of belief. The following questions are relied upon to prove the point:

"Q Was it worth pulling a knife on the Corporal to wake up others?

A I don't always pull a knife on people. I was mostly doing it as a a bluff.

Q Did you have any intentions of leaving the room?

A No, sir.

Q Were you going to pull a knife on him in order to wake up your friend?

A Well, no. Well, if he had seen the knife, I mean, any guy, he wouldn't come up on a knife. I figured he would get some Sergeant or something to come in and I'd probably explain to the Sergeant that I was to get Jenkins up out of bed on his feet. But as far as, I mean, I wasn't going to cut him. I had no intentions of cutting him. I had no intentions of cutting him.

Q Do you ordinarily pull a knife on people you don't intend to cut?

A No, sir. It was the first time I pulled a knife on anybody.

Q Why were you carrying a knife?

A I wanted one to use it to adjust telephones. To cut the mooring off the cables. For that reason I have to have something to cut the mooring. That's what I wanted the knife for."

Only the first, third, and fourth questions form the base for the argument by counsel. Standing alone, the questions do not establish bias or hostility, but defense counsel goes on to develop his argument by pointing to the law officer's instruction to the effect that an intent to inflict grievous bodily harm may be inferred from the intentional use of force likely to achieve that result. The argument concludes by asserting that these matters, taken together, rendered it likely that the accused's denial of an intentional cutting would be viewed as unworthy of belief by the court members. However, we think this argument does less than full justice to the record.

The caveat that a judge, or a law of-

**647**

ficer in the military, must hold himself impartial was well ex- ■■ pressed in Adler v United States, 182 Fed 464 (CA 5th Cir) (1910), where it was said:

". . . The impartiality of the judge—his avoidance of the appearance of becoming the advocate of either one side or the other of the pending controversy which is required by the conflict of the evidence to be finally submitted to the jury— is a fundamental and essential rule of especial importance in criminal cases. The importance and power of his office, and the theory and rule requiring impartial conduct on his part, make his slightest action of great weight with the jury. While we are of the opinion that the judge is permitted to take part impartially in the examination or cross-examination of witnesses, we can readily see that, if he takes upon himself the burden of cross-examination of defendant's witnesses, when the government is represented by competent attorneys, and conducts the examination in a maner [sic] hostile to the defendant and the witnesses, the impression would probably be produced on the minds of the jury that the judge was of the fixed opinion that the defendant was guilty and should be convicted."

Another cogent passage may be found in Frantz v United States, 62 F 2d 737 (CA6th Cir) (1933), to this effect:

". . . We do not intend to hold, or even to imply, that a federal judge may not participate directly in both civil and criminal trials, or propound such questions to witnesses as seem to him essential to the proper development of the case, or express his personal opinion upon fact issues, but in so doing he should always be calmly judicial, dispassionate, and impartial. He should sedulously avoid all appearance of advocacy as to those questions which are ultimately to be submitted to the jury."

Once we have stated the general rule, however, and turn to specific instances where partiality has been found, it

becomes plain that the actions of this law officer fell far short of offending against the caveat. Thus, in Williams v United States, 93 F2d 685 (CA9th Cir) (1937), the trial judge's examination of witnesses ran to 220 out of 675 pages, and the appellate court was unable to find "a single instance in which the court's intervention in the questioning was to assist the defendants." Indeed, it was the trial judge who did the most to establish the Government's case. Similarly, in Adler v United States, supra, the trial judge cross-examined many of the defendant's witnesses, characterized one of them as ignorant or evasive, belittled another, and at various times referred to defense counsel as "captious," "facetious," "half-cocked," and "troublesome." In Frantz v United States, supra, the trial judge was convinced of the guilt of the defendant, "and took no pains to avoid disclosure of this fact to the jury" throughout the trial.

Turning to this case, we are faced with half a dozen questions asked by the law officer in a relatively short trial. In the light of the accused's defense, the interrogation seemed essential to a proper development of the evidence. The questions asked did not assume any fact not conceded, and the answers elicited were not unfavorable to the accused. We sense no animosity toward the accused, and this isolated incident, not objected to by trial defense counsel, is simply too fragmentary and weak to convey to us an atmosphere of hostility. Moreover, the questioned instruction cannot be used to bolster the contention. Considered in the abstract, it is a sound instruction. Manual for Courts-Martial, United States, 1951, paragraph 207b(2), page 372. Applied to the facts of this case, it is appropriate. Considered in connection with the fact that the law officer three times told the court-martial that the accused denied any intentional wounding, it was fair.

VI

Lastly, we come to the remaining assignment of error which ■■■■■ bears discussion. This assertion of error is rooted in a contention that the law officer

648

failed to instruct on the elements of the lesser included offense of assault with a dangerous weapon. Here, defense counsel seem to be more concerned with form than with substance. The law officer failed to give, formally, the elements of this lesser offense, but this presents less than the full picture. He instructed fully on the principal offense and then went on to give a detailed explanation of the term assault. He defined the term, "dangerous weapon," at length, and then explained the legal meaning of such terms, used in the definition, as "grievous bodily harm." He pointed out in great detail that the difference between the offense charged and the lesser included offense of assault with a dangerous weapon lay in the intent required to establish the former offense. The law officer then went so far as to point out the amendments to the specification which should be made by the fact finders if they concluded the accused was guilty of only the lesser offense. Therefore, taken as a whole, we cannot say the law officer's instructions were inadequate to convey to the court-martial all the essential elements of assault with a dangerous weapon. Any further clarification thought desirable should have been requested by defense counsel. This he failed to do, and cannot now complain. United States v Johnson, 3 USCMA 447, 13 CMR 3.

Appellate defense counsel also complained of other parts of the instructions, which they claim were inappropriate or disadvantageous to the accused. The thrust of the complaint is aimed at an instruction wherein the law officer summarized part of the evidence to illustrate the legal principle under discussion. We find nothing here of sufficient importance to justify either a conclusion of error or extended discussion.

Accordingly, the decision of the board of review is affirmed.

QUINN, Chief Judge (concurring):

Although I concur generally with the principal opinion, I disagree with the reasoning in Part IV. In United States v Adams, 5 USCMA 563, 18 CMR 187,

this Court unanimously held that military personnel can protect their places of abode against unlawful intrusion. Here, after Jenkins told the accused to "go on, man, I don't want to go," and Corporal Inman, a co-occupant of the room requested accused to leave, his refusal made him a trespasser. In his own testimony, the accused admitted that he drew a knife. Although he denied an intention to inflict grievous bodily harm, his conceded purpose was to force Corporal Inman to stop his efforts to eject him from the room. Thus, he testified that he expected that Corporal Inman "wouldn't come up on a knife." Considering the accused's act, and his admitted purpose, there is no doubt that he committed an assault. Since the assault was with a knife, under circumstances indicating that it might result in death or grievous bodily harm, the offense of assault with a dangerous weapon was established by the accused's own testimony. United States v Norton, 1 USCMA 411, 4 CMR 3; United States v Smith, 4 USCMA 41, 15 CMR 41.

In view of my conclusion that the accused judicially confessed his guilt, I agree with Judge Latimer that the law officer did not overstep the bounds of propriety in expressing his opinion as to the guilt of the accused, but I think it appropriate to admonish law officers from engaging in the practice. Ordinarily, there is no need for an expression of opinion by the law officer, and as the United States Court of Appeals for the Tenth Circuit recently noted:

"The courts which have considered the question in the light of the Murdock decision [United States v Murdock, 290 US 389, 394, 54 S Ct 223, 78 L ed 381] have held that the exceptional cases which warrant the expression of such an opinion are limited to those in which the facts essential to the proof of guilt are virtually undisputed. Hartzell v. United States, 8 Cir., 72 F. 2d 569; United States v. Meltzer, 7 Cir., 100

F. 2d 739; United States v. Link, 3 Cir., 202 F. 2d 592." [Davis v United States, 227 F 2d 568, 570 (1955).]